IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 16, 2019

FILED

01/24/2020

Clerk of the
Appellate Courts

**STATE OF TENNESSEE v. LaTOYA ANN SHELTON**

**Appeal from the Circuit Court for Bedford County**
**No. 18472     Forest A. Durard, Jr., Judge**

_____

**No. M2018-00712-CCA-R3-CD**

_____

The Defendant, LaToya Ann Shelton, was convicted by a Bedford County jury of the sale or delivery of .5 grams or more of cocaine, a Class B felony; two counts of the sale or delivery of less than .5 grams of cocaine, a Class C felony; the possession of .5 grams or more of cocaine with the intent to sell or deliver, a Class C felony; simple possession of marijuana, a Class A misdemeanor; and possession of drug paraphernalia, a Class A misdemeanor.  The trial court sentenced the Defendant as a Range II, multiple offender to an effective term of twenty years in the Department of Correction.  On appeal, the Defendant challenges the sufficiency of the convicting evidence and argues that the twenty-year sentence of incarceration is excessive.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Matthew J. Crigger, Brentwood, Tennessee (on appeal), and Mitchell Ferguson, Murfreesboro, Tennessee (at trial), for the appellant, LaToya Ann Shelton.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Robert J. Carter, District Attorney General; and Mike Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case arises out of a series of controlled drug buys that a confidential informant working for the 17th Judicial District Drug Task Force ("Drug Task Force") made from the Defendant on three separate days in May 2015, which resulted in the execution of a search warrant at the Defendant's home and the seizure of more cocaine, marijuana, and digital scales. The Bedford County Grand Jury returned an 11-count indictment that charged the Defendant with the May 1, 2015 sale or delivery of .5 grams or more of cocaine, the May 6, 2015 sale or delivery of less than .5 grams of cocaine, the May 7, 2015 sale or delivery of less than .5 grams of cocaine, the May 9, 2015 possession of .5 grams or more of cocaine with the intent to sell or deliver, the May 9, 2015 possession of more than one-half ounce of marijuana with the intent to sell or deliver, and the May 9, 2015 possession of drug paraphernalia. Following a jury trial, the Defendant was convicted of all counts as charged, with the exception of the counts charging possession of marijuana with the intent to sell or deliver, for which she was convicted of the lesser-included offense of simple possession. After merging the sale and delivery counts, the trial court sentenced the Defendant as a Range II, multiple offender to an effective sentence of twenty years at thirty-five percent release eligibility in the Department of Correction.

The State presented five witnesses at the Defendant's trial: Vincent Cuevas, the undercover Drug Task Force officer who accompanied the confidential informant to the Defendant's home where the informant purchased the drugs; Lisa Hernandez, the confidential informant who purchased the drugs; and three additional Drug Task Force members who participated in the undercover operation and execution of the search warrant.

The State's first witness, Vincent Cuevas, testified he was currently employed by the Tennessee Air National Guard but in 2015 was an officer with the Lewisburg Police Department and assigned to the Drug Task Force. On May 1, May 6, and May 7, 2015, he participated in controlled drug buys in which the confidential informant arranged to purchase cocaine from the Defendant, and he drove the informant to the Defendant's home and waited outside in the vehicle while she went inside to complete the purchases. Each time, he posed as the individual for whom Ms. Hernandez was purchasing the drugs, while other undercover officers conducted surveillance outside the Defendant's residence. In each case, Ms. Hernandez was searched beforehand, provided a hidden recording device, given pre-recorded bills, and searched again after she returned to the vehicle and handed over the drugs.

On May 1, 2015, Ms. Hernandez texted the Defendant and arranged to purchase an "8-ball," or approximately 3.2 grams of cocaine, for $240. Mr. Cuevas drove Ms. Hernandez to the Defendant's home, pulled into the driveway, and remained in the vehicle while Ms. Hernandez went inside the residence to make the purchase. The

Defendant was standing on the front porch when they arrived, and she had a conversation with Ms. Hernandez about her suspicion that a vehicle parked outside her home contained a Drug Task Force agent. According to Mr. Cuevas, the Defendant wanted him to watch the suspicious vehicle while the drug sale transpired. He said the Defendant's suspicion was correct and that the vehicle contained an undercover Drug Task Force agent, Assistant Director Tim Miller, who was conducting surveillance.

The Defendant and Ms. Hernandez ultimately went inside the Defendant's home, and a short time later Ms. Hernandez returned to the vehicle and handed Mr. Cuevas 2.2 grams of crack cocaine. Mr. Cuevas stated that he weighed the substance immediately after Ms. Hernandez brought it to his vehicle and, in accordance with the role he was pretending to play, had Ms. Hernandez call the Defendant back to complain about his having been shorted in the drug deal. He identified the text messages between the Defendant and Ms. Hernandez and the audio recording of the transaction, which were published to the jury. In addition, he identified the Defendant's voice on the recording as the individual who could be heard arranging to sell the drugs to the informant and voicing her suspicions about the undercover vehicle in front of her home.

On May 6, 2015, Mr. Cuevas again participated in a controlled drug buy from the Defendant in which Ms. Hernandez arranged to buy one gram of crack cocaine from the Defendant for $100. On that day, Mr. Cuevas first picked up the informant, who was accompanied by her cousin, "Jacqueline," and drove the women around in his vehicle while Ms. Hernandez contacted various individuals in an unsuccessful attempt to arrange for an undercover drug buy. After the officers decided to give up for the night, Ms. Hernandez contacted Mr. Cuevas to let him know that she had made contact with the Defendant, who was willing to sell a gram of crack cocaine for $100. Mr. Cuevas therefore picked up Ms. Hernandez again, who was again searched and provided with a recording device and pre-recorded currency before he drove her and her friend, "Charity," to the Defendant's home for her to buy the drugs.

Mr. Cuevas testified that the Defendant and Jacqueline met Ms. Hernandez at the door of the Defendant's home. He could not recall if Charity accompanied Ms. Hernandez into the home or remained behind in his vehicle. He testified, however, that when Ms. Hernandez returned to his vehicle, she "slipped [him] the drugs because her friend was in the vehicle" with them. He debriefed Ms. Hernandez to the extent he was able with her friend in the vehicle, and she was later searched and the recording device retrieved. Mr. Cuevas identified the text messages between the Defendant and Ms. Hernandez arranging the transaction and the audio recording of the transaction, which were published to the jury. He also identified the Defendant's voice on the recording as the person who could be heard complaining about her "skates" or scales being broken.

The third controlled drug buy occurred the following day, May 7, 2015. Mr. Cuevas again identified the text messages between the Defendant and Ms. Hernandez arranging for the Defendant to sell Ms. Hernandez one gram of crack cocaine for $100, described the procedure used by the Drug Task Force team to record the transaction and to ensure that the informant had no drugs on her person before or after the transaction, and identified the audio recording of the transaction itself. He testified that he again drove the informant to the Defendant's house, where he pulled around to the back and waited in his vehicle while Ms. Hernandez went inside to buy the drugs. He said he saw the Defendant greet Ms. Hernandez at the door before the two women disappeared from his view into the house. No one accompanied him and Ms. Hernandez to the Defendant's home during the May 7 transaction. Although Mr. Cuevas identified the audio recording of the transaction, he did not specifically identify the Defendant's voice on the May 7 recording.

On cross-examination, Mr. Cuevas acknowledged that he was unable to view what occurred inside the Defendant's home, that he had never personally met her or had a conversation with the Defendant, that he had no personal knowledge of who sent the informant the text messages from the Defendant's phone, and that the informant was, to his knowledge, currently in jail.

The undercover informant, Lisa Hernandez, who acknowledged she was a methamphetamine addict, testified that she met the Defendant in late April 2015 when the Defendant gave the witness's cousin, Jacqueline Boman, a ride to the witness's house trailer. She said the Defendant gave her a cell phone number and told her to contact her if she needed any product, which the witness understood to be crack cocaine. She stated that she was already working as an undercover drug informant for the Drug Task Force at that time, so she let the director know that she could buy crack cocaine from the Defendant. She described the three undercover drug purchases she made on May 1, May 6, and May 7 with then-Agent Cuevas, who was posing as her cousin, and identified her text message exchanges with the Defendant and the audio recordings of the transactions. She also identified her voice and the Defendant's voice on the recordings. She testified that it was the Defendant each time who personally handed her the crack cocaine that she bought.

On cross-examination, she testified that Jacqueline was at the Defendant's house during the May 6 transaction. She said she never saw anyone named Paul there. She acknowledged it "[c]ould have been anybody" who sent her the text messages that originated from the Defendant's cell phone. She said she was currently in protective custody in Franklin County based on Bedford County charges and denied that she had been paid anything or promised leniency in exchange for her testimony. She

acknowledged, however, that the Drug Task Force possibly paid her $50 for each undercover drug buy.

Lieutenant Timothy Miller of the Lewisburg Police Department, who was the Assistant Director of the Drug Task Force in May 2015, corroborated Mr. Cuevas's testimony about the three controlled drug buys that took place on May 1, May 6, and May 7. He testified that he obtained a search warrant for the Defendant's residence, which he and other agents executed during the late night/early morning hours of May 8-9, 2015. The Defendant and a second woman, who he later learned was a visitor, were present in the home. Before knocking and forcing entry, he instructed Ms. Hernandez to call the Defendant and order an 8-ball of cocaine. From his position outside the home, he heard the Defendant's phone ring and the Defendant answer and say "yeah, I got it, come on whenever you're ready." During the search, agents uncovered in a bedroom drawer that contained women's clothing approximately eight grams of cocaine, a small amount of marijuana, two digital scales, $396 in cash, some plastic baggies, and two Crown Royal bags. Inside a purse in the same bedroom they found more cocaine and marijuana and an additional $716 in cash, for a total of nine grams of cocaine, 46 ounces of marijuana, and $1,116 in cash. Based on his training and experience, he concluded that the amount of cocaine, cash and associated paraphernalia indicated that the Defendant was trafficking in drugs.

Lieutenant Miller testified that the Defendant waived her rights and gave a statement in which she admitted that all the drugs belonged to her, although she claimed that her boyfriend, Paul Boykin, had a fifty percent ownership stake in them with her. The Defendant admitted that she and Mr. Boykin were both involved in the sale of drugs and said that Mr. Boykin had a much larger clientele than she did. The Defendant also named her supplier and expressed a willingness to work with the Drug Task Force in an effort to target that individual.

Two other Drug Task Force agents who participated in the search, the current Assistant Director of the Drug Task Force, Shane George, and Detective Jose Ramirez of the Marshall County Sheriff's Department, each described his participation in the execution of the search warrant in testimony that corroborated Lieutenant Miller's account. Detective Jose Ramirez, who overheard the Defendant's conversation with Lieutenant Miller, also corroborated Lieutenant's Miller's account of the admissions the Defendant made about her drug dealer role with her boyfriend, as well as her expressed interest in cooperating with the agents in an effort to target her supplier, a man with whom the agents were very familiar.

The parties stipulated that the substances involved in the May 1, May 6, and May 7 transactions consisted of 1.69 grams, 0.44 grams, and 0.4 grams, respectively, of

cocaine base, commonly known as crack cocaine, and that the substances seized from the home consisted of a total of 9.39 grams of cocaine base and 46.66 grams of marijuana.

The Defendant testified that in May 2015 she lived with her boyfriend, Paul Boykin, and his friend, Jamal Carter. She stated that the police did not have a search warrant when they showed up at her home, that they never found any crack cocaine in her purse, that the cocaine they found was in a drawer that she shared with her boyfriend, that they never read her her rights, and that she never gave them any indication she wanted to cooperate with them in targeting a drug supplier. She claimed, in fact, that the officers told her that they knew the drugs belonged to her boyfriend but because of her past "they would put it on [her] if [she] didn't work for them." The Defendant also claimed that it was her boyfriend who sold the crack cocaine to the informant and that she had never even seen Mr. Cuevas before trial. She said the only thing that the police found in her purse was one set of digital scales and 12 grams of marijuana.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant first challenges the sufficiency of the convicting evidence. Specifically, she contends that the evidence is insufficient to sustain her convictions that involved the sale of crack cocaine because none of the Drug Task Force Agents witnessed the transactions, and the informant "had clear bias as a witness such that a rational jury would not have believed her testimony." In the alternative, she argues that the relatively small amounts of drugs involved in each transaction do not justify felony drug convictions and that she should instead have been found guilty of casual exchange. As for the cocaine and marijuana found during the search of her home, she argues that the evidence is insufficient to sustain those convictions because her testimony that the drugs belonged to her boyfriend "was uncontroverted." The State responds by noting that credibility determinations are within the province of the jury and arguing that the evidence, which included the text messages, audio recordings, and corroborating testimony by the Drug Force Agents, was sufficient to sustain all of the convictions. We agree with the State.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92

(Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

We conclude that the evidence, when viewed in the light most favorable to the State, was more than sufficient to sustain the Defendant's convictions. By its verdicts, the jury showed that it accredited the testimony of the informant and the Drug Task Force agents over that of the Defendant, who, essentially, claimed that all the State's witnesses, confidential informant, and law enforcement officers alike, were lying against her. We, therefore, affirm the convictions.

## II. Sentencing

The Defendant contends that the trial court imposed an excessive sentence by unfairly considering her prior drug selling activities on May 1, May 6, and May 7 to enhance her B felonies committed on May 9 to the maximum twenty year sentence in her range. She argues that the May 1 through May 9 time period of her offenses should have been viewed by the court as a "single criminal episode." She further argues that it was unfair for the trial court both to enhance her sentences based on the prior felonies and rely on the same felonies for her classification as a multiple offender. Finally, she argues that the trial court should have given weight in mitigation to her cooperation with the law enforcement officers, as well as the fact that her offenses neither caused nor threatened serious bodily injury. The State responds by arguing that the trial court properly

exercised its broad discretion in imposing the twenty-year sentence. We, again, agree with the State.

A trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing; and

(8) The result of the validated risk and needs assessment conducted by the department and contained in the presentence report.

Tenn. Code Ann. § 40-35-210(b).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id.

At the February 22, 2018 sentencing hearing, the State introduced the Defendant's presentence report, which reflected that the thirty-three-year-old Defendant had a number of prior convictions, including misdemeanor drug convictions, driving and traffic-related

convictions, convictions for failure to appear and for theft, and two felony drug convictions based on offense dates of July 18 and July 21, 2006. The Defendant testified that the charges for which she had been convicted dated from three years earlier and asserted that she had "changed [her] life totally" since that period of time.

At the conclusion of the sentencing hearing, the trial court found the Defendant to be a Range II offender based on her two prior 2007 felony drug convictions, which the court found were either Class B or Class C felonies. The court found two applicable enhancement factors: that the Defendant had criminal behavior or criminal history in addition to that necessary to establish her range, which the court based not only on the Defendant's numerous prior convictions and arrests but also on her criminal behavior on May 1, May 6, and May 7; and that the Defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community, which the court based on the Defendant's having been arrested at least twice for driving on a revoked license while she was on probation for another offense. The court gave substantial weight to the Defendant's prior criminal behavior and found no applicable mitigating factors. Accordingly, the trial court sentenced the Defendant to concurrent terms of fourteen years for the Class B felony of selling .5 grams or more of cocaine on May 1, 2015, ten years for each of the Class C felonies, and twenty years for the Class B felony of possession of .5 grams of more of cocaine with the intent to sell on May 9, 2015, for an effective term of twenty years as a Range II offender in the Department of Correction. The trial court based the enhanced twenty-year sentence, in part, on the Defendant's criminal behavior of selling drugs on May 1, May 6, and May 7.

The record reflects that the trial court imposed a within-range sentence after proper consideration of all the evidence and testimony, the purposes and principles of our sentencing act, and consideration of the enhancement and mitigating factors. See Bise, 380 S.W.3d at 706. As the State notes, this court has previously held that it is the date of the offense, rather than the date of a conviction, that determines whether a defendant's prior criminal behavior can be used to enhance a sentence. "'The date of the offense, not the date of the conviction, determines whether offenses can be used to enhance punishment.'" State v. Wesley Lynn Hatmaker, No. E2017-01370-CCA-R3-CD, 2018 WL 2938395, at *6 (Tenn. Crim. App. June 8, 2018), perm. app. denied (Tenn. Oct. 11, 2018) (quoting State v. McKnight, 900 S.W.2d 36, 54 (Tenn. Crim. App. 1994), abrogated on other grounds by State v. Williams, 977 S.W.2d 101 (Tenn. 1998)). Therefore, in light of the presumption of correctness attached to the trial court's sentencing determinations, we affirm the trial court's imposition of the effective twenty-year sentence.

- 9 -

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE